UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DEBRA REDLIN,

    Plaintiff,                                             Civil Action No. 16-CV-14051

vs.                                                   HON. BERNARD A. FRIEDMAN

GROSSE POINTE PUBLIC SCHOOLS,

    Defendant.
_____/

## **OPINION AND ORDER GRANTING DEFENDANT'S<br>MOTION FOR SUMMARY JUDGMENT**

This matter is before the Court on the motion of defendant Grosse Pointe Public School ("the district") for summary judgment [docket entry 20]. This motion is fully briefed. Pursuant to E.D. Mich. LR 7.1(f)(2), the Court shall decide it without a hearing.

## **FACTS**

This is an employment discrimination case. In September 2012, the district hired plaintiff to be the Assistant Principal at Grosse Pointe South High School ("South"), where she worked alongside fellow Assistant Principal Terry Flint.

*Flint's Mistake.* This saga began in early 2014. South's deputy superintendent Jon Dean suspected that a social worker was coming to work intoxicated and planned to "surprise spot-check" him. Pl.'s Resp. p. 3. He told plaintiff and Flint not to warn the social worker, but Flint did warn him, which plaintiff reported to Dean. Flint initially claimed innocence but a few hours later confessed. After then-Superintendent Dr. Harwood met with Dean and the Board of Education, which hired an attorney to review the matter, he put a letter of censure in Flint's file,

threatened him with suspension, and put him on an individualized development plan ("IDP").[1] Flint Dep. pp. 20, 23. Harwood also noted the mistake in Flint's year-end evaluation.[2] *Id.* at 23, 86.

*Organizational Changes.* In July 2014, the district hired new South principal Moussa Hamka. Hamka began reorganizing the main office. He moved plaintiff's secretary to the financial department and made Flint and plaintiff share a secretary. Plaintiff testified that the shared secretary did not spend enough time helping her.[3] Plaintiff mentioned this to Hamka.[4] He encouraged her to keep working to improve the situation and asked both assistant principals to do "[a] lot of the secretarial stuff" to "help pull the load off of" the shared secretary. *Id.* at 31.[5]

Hamka also reapportioned assistant principal responsibilities. Plaintiff and Flint shared most duties equally, including student discipline, freshman orientation, testing requirements, individual special education accommodation ("504") plans, and all secretarial work the secretary could not do. After the reshuffle, plaintiff had the following new duties: running the positive behavioral intervention system ("PBIS"); ensuring that South was "not disproportionately suspending one group of students more than another"; and "student activities," including organizing a monthly principal advisory group meeting. Pl.'s Dep. pp. 19–23; Flint's Dep. p. 31. Flint testified that after the reshuffle he had the following duties: 504 coordinator and organizing

---

[1] Under an IDP, the employee sets certain goals in consultation with their supervisor(s); over the following year, those supervisors regularly consult with the employee to make sure those goals are being met. Dean Dep. p. 150.
[2] Year-end evaluations rank each employee as minimally effective, effective, or highly effective. Dean Dep. p. 146. Two years in a row of "minimally effective" ratings lead to termination. *Id.* at 151.
[3] The Court notes that this is not at all what plaintiff said in her 2014–2015 evaluation, where she indicated that her "new secretary" had done an "incredible job balancing the incredible duties assigned to her." Pl.'s Resp. Ex. 11, p. 7.
[4] Flint agrees that at this time their shared secretary "was overwhelmed." Flint Dep. p. 30.
[5] Critically, when defense counsel asked plaintiff if Hamka made this personnel decision specifically to target her, she testified only that Hamka had the authority to make this personnel change; she would not testify that she believed that he made the decision to target her. Pl.'s Dep. p. 24.

weekly and monthly meetings for two leadership groups and a mentor group. Flint Dep. pp. 30–41. Plaintiff believes that this apportionment left her with more work than Flint.

*C.M. Incident, Part 1.* One day in early December 2014, Flint, while speaking to plaintiff and their shared secretary, brought up the evaluation rubric for South's media specialist C.M.[6] Flint's and plaintiff's deposition testimonies sharply differ as to what exactly Flint said. According to Flint, he talked only about the rubric, not about C.M.'s review itself. According to plaintiff, Flint said that for "five days" over "Thanksgiving break" he was "trying to nail [C.M.] on her evaluation." Pl.'s Dep. p. 36. Plaintiff immediately told, among others, C.M. about the conversation and warned her to "keep an eye on her evaluation." *Id.* at 38. C.M., upset by this revelation, emailed Hamka about it. Hamka asked plaintiff and the secretary to put in writing exactly what Flint had said. *Id.* at 39. Plaintiff wrote:

> In a conversation this week [Flint, the shared secretary,] and I were chatting in the office about Thanksgiving Week (I believe). And [Flint] mentioned he spent the weekend working on [C.M.'s] evaluation and the rubric. He mentioned that he realized he was hard on her (because of the rubric) and went back in to add positive comments. . . .
>
> [Later, plaintiff told C.M. that Flint] thought b/c of the rubric he was hard on her and was going back/went in to the Google doc to add the positive.

Def.'s Mot. Ex. H. The secretary wrote:

> Flint was talking to [plaintiff] and me about how excited he was because he had spent many hours over the weekend going through the rubric for the teacher evaluations. He mentioned how he had worked in particular on [C.M.'s rubric] He was excited because he felt that the questions he came up with really hold teachers accountable for how they interact with students and staff, etc.

*Id.* at Ex. I.

---

[6] *See* Def.'s Br. p. 3 n.2. Each year the administrators evaluate the teachers using a rubric, which in this case is a written guide listing specific criteria for evaluation.

3

*Plaintiff's Complaints About Hamka.* Hamka's relationship with plaintiff appears to have been strained. In fact, during the few months they worked together preceding the C.M. incident, plaintiff kept copious notes about Hamka's actions that she found offensive, and she complained at length in her deposition about his behavior. When Hamka asked her to write out the statement regarding the C.M. incident, she took action.

The following day, plaintiff took her notes and met with Dean and the district's director of secondary education Maureen Bur. Her notes contained 39 numbered paragraphs, many of which detailed examples of allegedly offensive behavior. Pl.'s Dep. p. 64. Bur and Dean treated plaintiff's complaint as a hybrid gender discrimination/harassment complaint. They asked whether she wanted to resolve it formally or informally. Plaintiff chose to resolve it informally.

Bur and Dean conducted the informal investigation as follows: that same day, they met with Hamka to discuss plaintiff's harassment complaint and then conducted a "resolution meeting," which Hamka and plaintiff attended. During that meeting plaintiff presented her concerns and Hamka responded. At the end of the meeting, plaintiff and Hamka agreed to "work things out." Pl.'s Dep. p. 151. A few days later, Dean sent plaintiff an email summarizing the investigation's results and letting her know that, in the district's view, Hamka had not harassed or discriminated against her. Def.'s Mot. Ex. K. Because plaintiff chose not to request that the central office conduct a formal investigation the investigation ended there, and since then plaintiff has had no more issues with Hamka. Pl.'s Dep. p. 151.

*C.M. Incident, Part 2.* At some point in the week following Dean and Bur's investigation, plaintiff met with Dean to discuss her role in the C.M. incident. Dean told her that her conduct was inappropriate and that she would be disciplined. Dean Dep. p. 57. Plaintiff— who was already interviewing for administrative positions in other districts—told Dean that she

was "in the process of leaving. Wanting to get another job outside of the district." Pl.'s Dep. pp. 159, 243. Dean said in response, "I don't want to jam you up, so I will hold this [discipline] in abeyance."[7] *Id.* Dean also filed a placeholder "effective" evaluation with the State of Michigan pending the outcome of plaintiff's job search. *Id.* at 213. This allowed plaintiff to conduct her job search without any discipline or a substandard rating in her file. At her deposition, plaintiff agreed both that it was not "appropriate" for her to tell C.M. about Flint's comments and that the district should have disciplined her for it. *Id.* at 40, 156.[8] Nevertheless, the district never formally disciplined her for the C.M. incident. *Id.* at 212.

*The L.L. Incident.* Sometime in spring 2015, a South employee reported to plaintiff that at 6:00 p.m. on a Friday she saw female South teacher L.L. sitting on Hamka's desk and that this made her uncomfortable. *Id.* at 166. Plaintiff told Flint what she had heard, but neither she nor Flint brought this up with Hamka or the central office.[9] *Id.* at 169. Although Flint felt that L.L. dressed provocatively and was flirtatious—and he, too, had seen L.L. and Hamka in Hamka's office after hours—he never suspected that they were having an affair and was concerned only "with the appearance of things." Flint Dep. pp. 66–69. A few weeks later this rumor became more public, so Dean and Bur visited South to investigate. When it came out that Flint and plaintiff had heard this rumor but had not taken action, Dean verbally reprimanded them and threatened them with discipline; again, however, discipline was not meted out. *Id.* at 70, 76; Pl.'s Dep. pp. 170–72, 212; Dean Dep. pp. 137–38. Dean testified that he reprimanded both assistant principals for

---

[7] Dean agrees with plaintiff that the decision to hold discipline in abeyance was made after plaintiff told him of her continuing job search.
[8] The Court notes that C.M. requested that someone other than Flint evaluate her, but Flint evaluated her, gave her the highest possible rating, and eventually had a conversation with her about the matter that he found "reconciliatory." Flint Dep. p. 58.
[9] Flint recalled hearing this rumor only from plaintiff, though he was sure others talked about it as well. Flint Dep. p. 66, 75; Dean Dep. p. 133.

5

not bringing these rumors to the central office's attention, and plaintiff in particular for spreading these rumors. Dean Dep. p. 130.

*Plaintiff's 2014–2015 Evaluation.* Although Dean and Bur's investigation of plaintiff's harassment complaint ended with a finding of no harassment or gender discrimination, Dean considered it prudent for a woman and someone besides Hamka to evaluate plaintiff; so in early 2015 he decided that he and Bur would evaluate her. *Id.* at 140; Dean Dep. p. 143. Dean asked plaintiff to provide him periodic updates of her semester so his evaluation would be thorough. Pl.'s Dep. p. 140.

Generally, evaluations of administrators are due to the State of Michigan each year by June 30. Dean Dep. p. 145. But, as noted above, Dean agreed to withhold plaintiff's final evaluation until her job search concluded. So to comply with the June 30 deadline, Dean submitted a placeholder effective rating to the state. *Id.* at 147. Dean did not finalize plaintiff's evaluation until after she told him in late July that her job search was unsuccessful. Dean and Bur finalized plaintiff's evaluation on August 21, 2015. *Id.* at 148. Taking the C.M. and L.L. incidents into consideration, they rated plaintiff "minimally effective."[10] *Id.* at 148; Pl.'s Dep. p. 212; Def.'s Mot. Ex. M. Dean explained that plaintiff received this rating because she made four poor decisions—"[t]wice within the [C.M.] situation" and twice in the L.L. situation. Dean Dep. pp. 132.

*Transfer to Parcells.* Meanwhile, in June 2015, the district had hired a new superintendent, Gary Niehaus. After Dean and the district's attorney updated Niehaus on the situation at South, Niehaus decided to separate plaintiff and Hamka. On August 3, 2015, Dean

---

[10] Practically, receiving this rating means that the recipient is given a one-year contract instead of the standard two-year rolling contract, she is not eligible for merit pay or a step increase, she is put on an IDP, and the next year she is evaluated by a panel rather than one person. Dean's Dep. pp. 149–50. Notably, Dean and Bur did not amend their earlier "effective" evaluation they had given the state, though they could have. *Id.* at 147.

6

and Bur visited South to tell plaintiff that she would be switching positions with Steven Wolf, the Assistant Principal for Parcells Middle School. Normally this move would result in a pay decrease, but Niehaus testified that it was his understanding that plaintiff would continue "to be paid at the high school assistant principal rate."[11]  Niehaus Dep. pp. 43–44.  Plaintiff alleges that at some point in summer 2015, Dean asked that she resign, which she refused to do.  Pl.'s Dep. p. 195.

*2015–2016 Evaluation, Medical Leave, and Complaint Against Dean.*  Because of her minimally effective rating, plaintiff began the 2015–2016 school year with three evaluators—Dean, Bur, and Parcells Principal Dan Hartley.  Plaintiff disliked this arrangement, calling it "bullying," so in October 2015 Dean gave her the choice of being evaluated by Hartley and either himself or Bur, and he asked her to identify specifically what she considered "bullying."  Def.'s Mot. Ex. O.

Before plaintiff chose or described what she considered bullying, in November 2015 she took a medical leave of absence for psychiatric reasons until mid-March 2016.  Pl.'s Dep. pp. 332–33, 337, 341.  While plaintiff was on leave, the district paid her full salary, and she began working at Parcells immediately upon her return.  *Id.*

A month after her return, on April 13, 2016, Dean sent her two emails.  The first email said that because plaintiff had never chosen her 2015–2016 evaluaters, the district picked Bur and Hartley.  *Id.* at Ex. Q.  The second email reminded plaintiff that because of her minimally effective rating, she was supposed to have undergone a "thorough and in-depth evaluation for the 2015–2016 school year."  Pl.'s Resp. Ex. R.  It then stated that plaintiff's four-month leave made conducting such an evaluation "problematic."  *Id.*  So, it said, the district would complete an "interim evaluation" for the 2015–2016 school year.  If this interim evaluation rated plaintiff as

---

[11] When human resources discovered in summer 2017 that for two years it had been paying plaintiff the reduced middle-school-assistant-principal salary, it reimbursed her the over $8,000 she was owed.  Pl.'s Resp. Ex. 10.

7

effective or highly effective, the district would extend her one-year contract for the 2016–2017 school year, during which time she would undergo the full, in-depth evaluation. *Id.*

Four days later, plaintiff sent an email to Niehaus in which she made "a formal complaint of continued 'Harassment/Retaliation' against me by Assistant Superintendent Dr. Jon Dean during two emails sent to me in April, 2016." *Id.* at Ex. S. She claimed that Dean violated the Family Medical Leave Act ("FMLA") by holding her leave against her and that he falsified information about her that the public could obtain via the Freedom of Information Act. *Id.*

After plaintiff made this complaint, the district requested an independent investigation into plaintiff's complaint against Dean. Attorney Kevin Sutton conducted the investigation: He reviewed the district's policies and several documents, including the emails, and he interviewed plaintiff and Dean. *Id.* at Ex. T. In early June 2016, Sutton found that Dean did not violate district policy or any federal or state law. *Id.* Indeed, he wrote, even if Dean could have phrased his emails more kindly, "there still exists no reasonable basis to conclude that the emails form a basis for a conclusion of harassment or retaliation." *Id.*

A few weeks later, after hearing from Hartley that plaintiff was doing an excellent job at Parcells, Niehaus changed course on plaintiff's interim evaluation and directed Bur and Hartley to give her a full evaluation, which they did, rating her effective; he also directed that, going forward, she be given a two-year contract, taken off of the scheduled IDP, and be evaluated by only one person. *Id.* at Exs. U, V; Bur Dep. pp. 125–32; Dean Dep. pp. 205–08; Niehaus Dep. pp. 32–35; Hartley Dep. pp. 34–35.

*2016–2017 and 2017–2018 School Years.* Initially, plaintiff believed that she was on an IDP and that she would have multiple evaluators. Pl.'s Dep. pp. 381–84. Hartley testified that he told her at the beginning of the year that she was not on an IDP and that he would be her

8

sole evaluator. Hartley Dep. p. 35. This confusion led to a lengthy email exchange in late November 2016 between plaintiff and Hartley, in which plaintiff inquired about her IDP and her evaluator(s). Def.'s Mot. Ex. W. Hartley reiterated that in the 2016–2017 school year he would be her sole evaluator. *Id.* After that exchange, the school year finished without incident and Hartley rated her "effective." *Id.* at Ex. X.

*This Litigation.* In November 2016, plaintiff filed her original complaint, which she amended in August 2017. The amended complaint asserts five counts: Count I, gender discrimination/sexual harassment under Title VII, 42 U.S.C. § 2000e–2(a)(1); Count II, retaliation under Title VII; Count III, a violation of the FMLA, 29 U.S.C. § 2601; Count IV, gender discrimination/sexual harassment claim under the Elliott-Larsen Civil Rights Act ("ELCRA"), Mich. Comp. Laws § 37.2202(c); and Count V, retaliation under ELCRA.

## LEGAL STANDARD

Federal Rule of Civil Procedure 56(a) states that any party moving for summary judgment must identify "each claim or defense . . . on which summary judgment is sought. The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." A party must support its assertions by:

> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
>
> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1). "The court need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3). If the moving party satisfies this burden, the burden shifts to the nonmoving party to show that there is a genuine issue of material fact for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). "[T]he mere existence of a scintilla of evidence in support of the [nonmoving party's] position will be insufficient" to defeat a motion for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). "[T]he requirement is that there be no *genuine* dispute as to any *material* fact." *Id.* at 247–48. "The pivotal question is whether the party bearing the burden of proof has presented a jury question as to each element of its case." *Hartsel v. Keys*, 87 F.3d 795, 799 (6th Cir. 1996).

## DISCUSSION

### I. Counts I and IV—Gender Discrimination[12]

Plaintiff argues that two facts show that the district discriminated against her on the basis of her gender: (1) she received "unwarranted discipline and a demotion" compared to Flint, who allegedly "engaged in similar . . . conduct and was neither disciplined nor demoted" and (2) she had a larger workload than Flint during the 2014–2015 school year. Pl.'s Resp. p. 18.

Under Title VII, it is unlawful for an employer to "discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1). In Title VII cases, the Court applies

> the *McDonnell Douglas* burden-shifting analysis where a plaintiff attempts to use circumstantial evidence to prove a discrimination claim where, as here, there is no direct evidence. To establish a prima facie case under *McDonnell Douglas*, a plaintiff must present evidence that (1) she is a member of a protected class; (2) she was qualified for the job and satisfactorily performed it; (3) she suffered

---

[12] As the Court applies the same standard for both Title VII and ELCRA claims, it will discuss Counts I and IV together. *Fuller v. Michigan Dep't of Transp.*, 580 F. App'x 416, 422 (6th Cir. 2014).

an adverse employment action; and (4) others, similarly situated and outside the protected class, were treated differently. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973).

*Bruce v. Meharry Med. Coll.*, 692 F. App'x 275, 278 (6th Cir. 2017) (citations omitted and edited). Here, the parties dispute elements (3) and (4). As plaintiff notes, the Supreme Court has stated that for a change in the workplace to be an "adverse employment action," it must be "significant," including "reassignment with significantly different responsibilities." *Burlington Indus. v. Ellerth*, 524 U.S. 742, 761 (1998). That is, the "change in employment conditions must be more disruptive than a mere inconvenience or an alteration of job responsibilities." *Kocsis v. Multi-Care Mgmt., Inc.*, 97 F.3d 876, 886 (6th Cir. 1996) (internal quotation marks and citation omitted).

On this record, no reasonable jury could find that plaintiff sufficiently shows elements (3) and (4). Turning first to the demotion-discipline argument, no reasonable jury could find that Dean, Bur, or Niehaus discriminated against her on the basis of gender because plaintiff testified that, in her view, there is no genuine issue as to whether they did so:

> Q This harassment that you're referring to - and I'm speaking about harassment subsequent to your tour at South High School. Was it gender harassment?
> A I believe it was continued retaliation on the part of -
> Q No, no, no, no, no. Answer my question. Was it gender harassment?
> A No.
> Q Okay. Retaliation, you say that in the letter, but say "harassment or retaliation." I'm going one at a time.
> A Okay.
> Q Was there harassment that was related to your religion? Your race? Your gender? Any other –
> A In the case of this FOIA e-mail, no.
> Q And at any time you left South High School?
> A You know, my gender complaint was regarding Moussa Hamka[.] Really not –
> Q That's what I thought.
> A -- examined everything to look at it from the aspect or Dr. Dean and Maureen Bur.

11

> Q  All right. I'm asking you now, was there gender harassment by Dr. Dean and/or Maureen Bur?
> A  I considered it retaliation, not –
> Q  Come on. You know it's not harassment; don't you?
> A  I call it retaliation, is what I've indicated,
> Q  But here you call it "harassment or retaliation." I'm trying to rule out harassment. I know what you mean when you say "retaliation."
> A  If you take out the gender part or the harassment, I can call it harassment.
> Q  Okay.
> A  Do I think they were picking on me because I was a woman in this particular case? No.
>
> \*\*\*
>
> Q  Is there anything in your complaint of harassment that relates to Dr. Dean or Miss Bur?
> A  No.

In short, plaintiff testified that although several people mistreated her, only Hamka did so based on her gender. Given that plaintiff herself does not believe that her "discipline" and "demotion" were motivated by gender animus, no reasonable jury could either.

Further, Flint's 2014 discipline and plaintiff's transfer to Parcells are not similarly situated because only Flint was actually disciplined and different superintendents made these decisions. *Jackson v. FedEx Corp. Servs., Inc.*, 518 F.3d 388, 393 (6th Cir. 2008) (stating that to be similarly situated, the individual "with whom the plaintiff seeks to compare his/her treatment must have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it"). And to the extent that the district treated Flint's and plaintiff's infractions differently, Dean explained that this difference was warranted because plaintiff made several more mistakes in judgment than Flint. Finally, Niehaus explained that he transferred plaintiff to avoid potential workplace friction, not because of plaintiff's gender. Plaintiff fails to rebut these explanations.

Turning second to the increased-workload argument, on this record, no reasonable jury could find that Hamka significantly increased plaintiff's 2014–2015 workload, or that he assigned significantly more work to plaintiff than Flint. First, the record shows that the 2014–2015 workloads for both plaintiff and Flint grew somewhat, but plaintiff has not shown that this growth was anything but an inconvenience. Based on this record, a reasonable jury could determine that plaintiff was disrupted by this reassignment, but disruptions alone are not enough to show discrimination. *Kocsis*, 97 F.3d at 886.

Second, the record shows that generally, including in 2014–2015, plaintiff and Flint split the vast majority of duties equally. Plaintiff had only two new responsibilities that Flint did not have—PBIS and disproportionate suspensions. And Flint had a responsibility that plaintiff did not have—special education accommodations coordinator. No evidence shows that plaintiff's workload was disproportionately larger than Flint's. Plaintiff's assertion to the contrary is based purely on her feelings and guesses, not on evidence. Feelings alone are not enough for a reasonable jury to find that Hamka discriminated against plaintiff on the basis of gender. *Grizzell v. City of Columbus*, 461 F.3d 711, 724 (6th Cir. 2006) (stating that "personal beliefs" cannot alone support a reasonable inference of gender discrimination).

## II.  Counts II and V—Retaliation[13]

Plaintiff argues that after she submitted her harassment complaint about Hamka to Dean and Bur, the district retaliated against by threatening her with and then unjustly withholding discipline because of the C.M. incident, evaluating her "minimally effective," and transferring her to Parcells. Pl.'s Resp. pp. 25–26.

---

[13] As with gender-discrimination claims, the Court treats retaliation claims the same under Title VII and ELCRA. *Kuhn v. Washtenaw County,* 709 F.3d 612, 627 (6th Cir. 2013). Therefore, so the Court will consider Counts II and V together.

The Sixth Circuit recently articulated the standard for retaliation claims:

> "The McDonnell Douglas burden-shifting framework also applies to retaliation claims." *Martin v. Toledo Cardiology Consultants, Inc.*, 548 F.3d 405, 412 (6th Cir. 2008) (citing *Clay v. United Parcel Serv., Inc.*, 501 F.3d 695, 713 (6th Cir. 2007)).
>
> To make out a prima facie case of retaliation, a plaintiff must establish that: (1) she engaged in activity protected by Title VII; (2) this exercise of protected rights was known to the defendant; (3) the defendant thereafter took an adverse employment action against the plaintiff; and (4) there was a causal connection between the protected activity and the adverse employment action. *Id.* (citing *Ford v. Gen. Motors Corp.*, 305 F.3d 545, 552–53 (6th Cir. 2002)).
>
> "Once the plaintiff has made out a prima facie case, the burden of production shifts to the employer to proffer a legitimate, nondiscriminatory reason for its actions." *Id.* (citing *Niswander v. Cincinnati Ins. Co.*, 529 F.3d 714, 720 (6th Cir. 2008)). "If the employer meets this burden, the burden then shifts to the plaintiff to demonstrate by a preponderance of the evidence that the legitimate reason given by the employer was a pretext for retaliation." *Id.*

*Lee v. Cleveland Clinic Found.*, 676 F. App'x 488, 499 (6th Cir. 2017). Here, both element (4) and whether the transfer was pretextual are at issue.[14] The Supreme Court has explained that "Title VII retaliation claims must be proved according to traditional principles of but-for causation, not the lessened causation test stated in § 2000e–2(m). This requires proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 360 (2013). Practically, then, "a Title VII plaintiff alleging retaliation cannot establish liability if her firing was prompted by both legitimate and illegitimate factors." *Seoane-Vazquez v. Ohio State Univ.*, 577 F. App'x 418, 428 (6th Cir. 2014) (quoting *Nassar*, 133 S.Ct. at 2546 (Ginsburg, J., dissenting)).

---

[14] For purposes of this order, unless noted otherwise, the Court will assume that filing the harassment complaint against Hamka was a protected activity under Title VII, that the district knew of it, and that the complained-of actions were adverse.

Based on this record, no reasonable jury could find that the district took its complained-of actions because plaintiff complained to Dean about Hamka. First, regarding Dean's alleged threats, because plaintiff testified that she deserved discipline for her role in the C.M. incident, Dean's alleged threat of discipline was justified. Further, plaintiff admitted that Dean withheld discipline and her final evaluation because she told him of her job search and he did not want to "jam her up." Plaintiff merely guesses that Dean waited because he wanted to force her to resign. But she cannot remember if it was Dean's idea to hold her discipline and final evaluation in abeyance, nor can she articulate a motive for Dean to retaliate, stating that she "can't answer why" he would do so. Pl.'s Dep. pp. 327–28. Finally, she does not argue that Dean ever hinted that suggestions of resignation were connected to her complaint. Given that plaintiff has advanced only speculations unsupported by evidence, no reasonable jury could find Dean's actions retaliatory.

Second, regarding plaintiff's "minimally effective" evaluation, Dean and Bur testified that she received this rating because of her role in the C.M. and L.L. incidents. As noted, plaintiff concedes that she made these mistakes. Because plaintiff has not produced any evidence showing that Dean and Bur's reasons are false, no reasonable jury could find that her 2014–2015 evaluation was retaliatory. Just as an "employee's decision to report discriminatory behavior cannot immunize that employee from those petty slights or minor annoyances that often take place at work," nor does it insulate her from the consequences of admittedly poor judgment. *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006).

Third, regarding plaintiff's transfer to Parcells, even if her complaint was *a* reason for the transfer, so long as it was not *the* reason, plaintiff cannot show but-for causation. Niehaus testified that he transferred plaintiff to avoid staff conflict and because it appeared that South's

15

atmosphere of trust was destroyed. Plaintiff does not cite any evidence showing that this is false—she merely conjectures that Niehaus was retaliating.[15]

In sum, because for each of the district's complained-of actions it has given legitimate, reasonable, and non-discriminatory explanations—i.e., not wanting to jam plaintiff up, plaintiff's role in the C.M. incident, and potentially a poor working relationship between plaintiff and Hamka—and because plaintiff has produced no evidence disputing these explanations, under *Nassar* and *Seoane-Vazquez*, she cannot establish that her harassment complaint was the but-for cause of the complained-of actions or that the district's explanations are mere pretexts.

### III. Count III—FMLA

Plaintiff argues that the district retaliated against her after she took FMLA leave by: rating her "effective" instead of "highly effective" for the 2015–2016 school year; failing to give her a final review for the 2015–2016 school year; failing to give her a two-year contract renewal at the end of the 2015–2016 school year; and keeping her on an IDP plan through the 2016–2017 school year.

The evidence shows, however, the district removed her from her IDP plan, gave her a two-year contract, and created a final review for her. Plaintiff does not dispute these facts, but argues that her impression that she was being punished was reasonable and the "only possible impression." Pl.'s Resp. p. 35. Plaintiff's impression is irrelevant because the fact of the matter is that Niehaus did not impose the conditions he originally suggested. And although plaintiff argues that she was entitled to a "highly effective" rating, she does not support this claim with evidence. Based on this record, no reasonable jury could find that the district retaliated against plaintiff for taking FMLA leave.

---

[15] Although it is not the basis of the Court's decision, the Court notes that, given that Niehaus ordered that plaintiff was to keep her title and salary, no reasonable jury could find that this transfer was an adverse employment action.

## CONCLUSION

For the reasons stated above, the Court concludes that no reasonable jury could find that defendant discriminated or retaliated against plaintiff based on her gender or because she took FLMA leave.

Accordingly,

IT IS ORDERED that defendant's motion for summary judgment is granted.

Dated: May 10, 2018  
Detroit, Michigan

s/Bernard A. Friedman  
BERNARD A. FRIEDMAN  
SENIOR UNITED STATES DISTRICT JUDGE

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on May 10, 2018.

s/Johnetta M. Curry-Williams  
Case Manager